# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 07 CR 227 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| JOHN TOMKINS, ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant John Tomkins's motion for an evidentiary or *Franks* hearing [175]. For the reasons set forth below, the motion [175] is respectfully denied.

## I.     Factual Background

The superseding indictment alleges that between approximately May 2005 and January 2007, Defendant John Tomkins mailed a series of threatening letters and packages, including pipe bombs, to various investment firms and their employees. Through those letters and packages, Defendant allegedly attempted to induce the investment firms and their employees, by threats of kidnapping, bodily injury, and death, to manipulate and cause the common stock of 3COM and Navarre Corporation to trade at artificially high prices, thereby fraudulently increasing the market value of Defendant's investment positions in those stocks.

As to 3COM, the superseding indictment specifically alleges the following: From about January 2005 and continuing through September 2005, Defendant acquired shares of 3COM stock and call option contracts. Beginning in May 2005, and continuing through October 25, 2005, Defendant sent a series of three threatening letters to investment company executives in which he attempted to induce the executives to manipulate the price of 3COM stock by making purchases sufficient to drive the price of the stock to $6.66 by October 31, 2005. In a letter to an investment company executive dated May 23, 2005, Defendant wrote: "I need for you to start

buying stock in 3Com Corporation (COMS). You have until October 31 to get the price to 6.66. If you can accomplish it sooner all the better that way you will not have to worry about hearing from us again but it MUST be done by then NO EXCUSES." The indictment further alleges that Defendant warned that, if his demands were not met, the executive could suffer grave consequences: "You will help, after all it is so easy to kill somebody it is almost scary. Just think it could be as simple as mailing a package just like The Unibomber used to do, or maybe like Salvo did in the D.C. sniper case just a small hole in the trunk of the car and BANG!!" The letter also warned: "[P]ossibly the worst thing that can happen to someone is to have a child or grandchild go missing. Kids are snatched all the time." Finally, the letter cautioned the executive not to go to the authorities: "And don't even think about going to the authorities because as I said there are so many choices for me to be able to reach out and touch your life that it is not worth the risk."

The indictment further alleges that Defendant attempted to similarly manipulate the price of Navarre Corporation stock for his own financial benefit. According to the indictment, Defendant purchased shares of Navarre stock beginning in January 2006 and continuing through December 2006, and also purchased shares of Navarre call option contracts beginning in February 2006 and continuing through March 2007. Then, in approximately March 2006, after making his initial Navarre stock and option purchases, and continuing through February 2007, Defendant sent a series of threatening letters to investment companies and investment company executives, in which he demanded that sufficient purchases of Navarre stock and options be made to drive up the price of the stock to certain target prices, by certain deadlines. For example, on approximately March 13, 2006, Defendant mailed four letters, including one to a senior officer of Navarre. In that letter, Defendant complained of the officer's compensation and

the decline in the price of the company's stock, and made threats against the executive and his family:

> The way I see it you owe it to us to make things right or I will make your life as miserable as mine. The one thing that you need to remember is that no one is out of reach * * * * You will help, after all when you stop and think about how easy to kill somebody it is almost scary. Just think it could be as simple as mailing a package just like The Unibomber use to do it is so easy it can be done from anywhere and if it wasn't for the fact that he was turned in by his own brother he may have never Salvo did in the D.C. sniper case just a small hole in the trunk of the car with high powered riffle and BANG!!

The letter then set forth the following demands:

> By now you are wondering what I am expecting from you, well it is rather simple actually, within the next 60 days you are going to find a way to reverse the downward spiral of the stock price and get it over $6.66 or the devil will be paying you a visit. I do not care if you have to buy all the shares yourself. It would do wonders for the stock price if there was to be a rumor that you were thinking of taking the company private it sure would fuck with all those asshole short sellers or if you have to you could suck off a couple of mutual fund mangers in order to get them to buy this stock * * * I really don't care but whatever you do the price had better reverse in a hurry.

The three other March 13 letters were addressed to investment company executives, contained similar threatening language, and demanded that the corporation stock price move to $6.66 by May 1, 2006.

In addition, according to the superseding indictment, on or about June 9, 2006, Defendant mailed approximately four more letters from Palatine, Illinois. Three of those letters were addressed to investment management executives and stated:

> TIMES UP
>
> LET'S MAKE THIS INTERESTING SHALL WE. I HAVE ACQUIRED 3 TARGETS. ONE IS A RELATIVE, ONE IS A CO-WORKER'S RELATIVE AND ONE IS A FRIEND OR NEIGHBOR. IF FROM JUNE 13 THROUGH JUNE 17 NAVR'S CLOSING STOCK PRICE IS GREEN ON ONE OF THE FOUR DAYS I WILL SHIP ALL THREE PACKAGES. IF IT ENDS GREEN ON TWO OF THE DAYS I WILL SHIP TWO PACKAGES, IF IT ENDS GREEN ON THREE OF THE DAYS I WILL SHIP JUST ONE. IF ALL FOUR

DAYS END GREEN THEN YOU WILL HAVE BOUGHT YOURSELF ANOTHER MONTH.

IT IS BETTER TO REIGN IN HELL, THAN TO SERVE IN HEAVEN

The indictment further alleges that on January 26, 2007, Defendant deposited for mailing at the Rolling Meadows Post Office in Rolling Meadows, Illinois, two parcels addressed to individuals at investment firms. One parcel was addressed to an individual at Janus Small Cap ("Janus") in Denver, Colorado. A second parcel was addressed to an individual at American Century in Kansas City, Missouri. Each parcel contained an improvised explosive weapon, commonly known as a pipe bomb, and a letter stating as follows:

BANG!! YOU'RE DEAD

Stop and think about that for a second. Think about the effect it would have on your family. The only reason you are still alive is because I did not attach one wire. If you do not believe me then go ahead and touch that red wire to the top of the battery pack. There is enough gunpowder and steel shot in that tube to kill anyone in a ten foot radius when it goes off.

Now imagine how you will feel when I mail that same package to one of your family members or neighbors or co-workers and yes I will be sure to connect all the little wires.

Now if you decide you want to keep the people around you safe, you will do as I say.

On February 7, 8, & 9 there is going to be a rally in the stock price in a company called Navarre (NAVR).

On the 7th the closing price will be above 4.90

On the 8th the closing price will be above 5.75

And on the 9th the closing price will be above 6.50

This is not a hoax.

There is nothing the police or anybody else can do so do not contact them.

> Everything that it takes to make these little care packages can be purchase at any Home Depot& Wal-Mart so there is nothing to be traced. There are no finger prints or DNA and nothing to match it to, so be smart and do what I am asking.
>
> Although you are not alone, all of you will be punished if you fail.

On April 25, 2007, law enforcement officers arrested Defendant and executed search warrants at his residence, at two storage units rented by Defendant, at his place of business, and on various vehicles. The Government states that, among other things, the search of Defendant's residence led to the seizure of financial records showing Defendant's purchases of 3COM and Navarre stock, drafts of the threatening communications sent to the victims, research into the addresses of and other locations associated with the victims, proof of travel to Orlando, Florida, during the time in which some of the threatening communications were mailed from Kissimmee, Florida, and documents and other records related to bomb making. Among other things, the search of Defendant's storage unit led to the seizure of bomb making materials, including materials similar to those used to build the devices mailed in January 2007, two improvised explosive devices, one of which was packaged and ready to be mailed, drafts of the threatening communications sent to the victims, and addresses and other information relating to the victims. Among other things, the search of Defendant's vehicles led to the seizure of bomb making materials.

Defendant is charged in a superseding indictment with ten counts of mailing threatening communications, 18 U.S.C. § 876(b), two counts of illegal possession of a destructive device, 26 U.S.C. § 5861(d), and one count of using a destructive device in connection with a crime of violence, 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii).

**II.    Analysis**

Defendant argues that he is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). In order to be entitled to a *Franks* hearing, a defendant must make a substantial preliminary showing that (1) a false, misleading or omitted statement was included in the affidavit supporting the warrant; (2) the affiant made the false statement intentionally or with reckless disregard for the truth; and (3) the false, misleading or omitted information was necessary for the judicial finding of probable cause. *Franks*, 438 U.S. at 155-56. The Seventh Circuit has observed that "the three elements necessary to entitle a defendant to a *Franks* hearing 'are hard to prove, and thus *Franks* hearings are rarely held.'" *United States v. Maro,* 272 F.3d 817, 821 (7th Cir. 2001) (quoting *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000)). A defendant seeking a *Franks* hearing bears a substantial burden to demonstrate probable falsity. *Franks*, 438 U.S. at 170; *Maro,* 272 F.3d at 821. The defendant must "offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard." *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003). The presumption of validity of the warrant "cannot be overcome by defendant's self-interested inferences and conclusory statements." *Id.* at 822-23. Moreover, "an unimportant allegation, even if viewed as intentionally misleading, does not trigger the need for a *Franks* hearing." *United States v. Swanson*, 210 F.3d 788, 791 (7th Cir. 2000).

In his motion, Defendant identifies two purportedly false statements and four purportedly omitted facts that he claims justify a *Franks* hearing and suppression of the evidence found at the storage units. First, Defendant challenges the truth of the following statement found in the affidavit: "[a] review of the property revealed a number of detached garages within the same

property. Many of the garages were open to reveal small work spaces containing work benches, tools, equipment, and supplies. None appeared to be suitable for vehicle storage of any type." Defendant specifically challenges the last sentence – "None appeared to be suitable for vehicle storage of any type" – and asserts that the storage units in fact "were designed and intended for vehicle storage." Def. Br. ¶ 12. Defendant further contends that "[t]his was not a simple mistake by the Inspectors, this was a deliberate attempt to mislead the Magistrate as to the likely usage of the storage units." *Id*.

In its response brief, the Government acknowledges that the storage units could have been used to store vehicles and that vehicles were indeed found in Defendant's storage units (along with bomb making materials, fully assembled pipe bombs, and documents relating to the victims in this case). However, Defendant has not established that the challenged statement was knowingly and intentionally false, or made with reckless disregard for the truth. When the statement is read in the context of preceding sentences of the affidavit, it is clear that the agent was reporting what he observed when he drove by the storage units, including a number of open units which had "small work spaces containing work benches, tools, equipment, and supplies," and not any open units which had vehicles parked within them or which were capable of containing cars in light of the other items in the storage unit. Such reporting of the agent's observations is insufficient to conclude that the statements were knowingly and intentionally false, as the magistrate judge was apprised of the scope of the agent's inquiry and representations—i.e., that the garages did not "appear[ ]" to be suitable for vehicle storage.

Moreover, even if the agent's statements had been knowingly and intentionally false, that circumstance would not negate probable cause. If the Court struck the sentence "[n]one appeared to be suitable for vehicle storage of any type," the affidavit would contain the following

7

unchallenged statements regarding the potential use of the storage facilities and the likelihood that evidence and instrumentalities of the charged crimes would be found within them:

> Inspector Martin Drove by the Penn Place Apartments on April 18, 2007, which are located at 3702 Pennsylvania Avenue, Dubuque, Iowa 52002. A review of the property revealed a number of detached garages within the same property. Many of the garages were open to reveal small work spaces containing work benches, tools, equipment, and supplies.
>
> Based on my knowledge, training, and experience, and information from other agents, I know that storage units often contain tools, equipment and other items that could be used in the manufacturing of explosive devices. Such units are also used to store documents.

Those statements, when read in connection with the rest of the affidavit and warrant application as a whole, were sufficient to establish probable cause to search the storage units for the requested evidence.

Similarly, if the affidavit had included the fact that the storage units were capable of storing vehicles, that additional information would not have negated probable cause. Simply put, that fact that the units could have held a vehicle in no way indicates that the units also could not hold the other items sought in the search warrant. Indeed, Defendant's two storage units actually held vehicles (one in each unit), yet also contained bomb making materials, fully assembled pipe bombs, and documents relating to the victims in this case.

Defendant next argues that the affidavit fatally omitted reference to the fact that he had five vehicles and a boat trailer registered in his name. Def. Br. ¶ 6. However, Defendant has not demonstrated that his ownership of other vehicles was omitted from the affidavit with the intent to make the affidavit misleading. Quite the opposite—on the same day that the Government sought and obtained the search warrant for the storage lockers, the Government also sought and obtained a search warrant for Defendant's personal residence and "all vehicles" located on the property. In the affidavit for that search warrant, the Government listed four vehicles associated

with defendant based on information provided by the Iowa Department of Transportation. Both applications were submitted to the same Magistrate Judge in Iowa—and both warrants were authorized—within minutes of each other. Given that timing, there is no basis for concluding that any facts concerning Defendant's vehicles were omitted with the intent to make, or in reckless disregard of whether they made, the affidavit misleading.

Defendant also complains that the affidavit failed to disclose that he had rented the storage units since June 2003, nearly two years before the May 2005 events underlying the criminal complaint. Given that omission, Defendant submits that the Magistrate Judge "was prevented from concluding that these storage units had a legitimate legal use that predated the alleged criminal conduct in this case." Def. Br. at ¶ 14. That argument misses the mark, because even assuming that Defendant had rented these storage units for years or even decades prior to the alleged criminal activity, that fact would not in any way negate probable cause that evidence of the crimes would be found in the storage units, which was based on (1) tying Tomkins to the storage units and (2) the agent's statement that, "Based on my knowledge, training, and experience, and information from other agents, I know that storage units often contain tools, equipment and other items that could be used in the manufacturing of explosive devices. Such units are also used to store documents." In other words, the fact that Defendant may have used those storage units for lawful purposes prior to engaging in the alleged criminal conduct does not mean that he also did not use those storage units in connection with his criminal activity. As the Government notes, under Defendant's reasoning, the fact that a person may have lived a law-abiding life for years in his residence before engaging in criminal conduct would negate probable cause to conclude that evidence of the crime could be located within that residence. This would be true no matter what the other circumstances known to Government agents and investigators

9

showed in regard to the likelihood that evidence of a crime might be found at the residence. Neither law nor logic supports such reasoning.

Defendant next challenges the statement in the affidavit that "Inspector Martin discovered monthly payments of $200.00 from Tomkins to Penn Place Apartments for storage. The checks made payable to Penn Place Apartments had 'storage' listed in the memo section." Def. Br. ¶ 10. Defendant claims that this statement is false because "Mr. Tomkins has never made 'monthly payments of $200.00 * * * to Penn Place Apartments for storage." Def. Br. ¶ 13. As the Government points out, Defendant does not argue that (1) that he did not write $200 checks to Penn Place Apartments for the storage units or (2) that the memo lines did not include references to storage. Such an argument would seem to be precluded by the checks that the Government contends have been produced in discovery, which show $200 payments made to Penn Place Apartments and note "storage" in the memo lines. Instead, Defendant appears to be quibbling with the affidavit's characterization that the $200 payments were "monthly." The Government concedes that the $200 payments appear to be for two months of storage, not for individual months. But at best, Defendant has identified an inadvertent discrepancy in the affidavit. Striking the word "monthly" from the affidavit, still would leave the following facts before the Magistrate Judge, from which he could have concluded that Defendant was renting the storage units in question:

> On April 17, 2007, Inspector Cody Martin reviewed subpoenaed bank records and checks from John Tomkins' checking account. Inspector Martin discovered payments of $200.00 from Tomkins to Penn Place Apartments for storage. The checks made payable to Penn Place Apartments had "storage" listed in the memo section.

> On Monday, April 23, 2007, Dubuque Police Department sources verified through a Penn Place Apartments employee that John Tomkins is currently renting units 113 and 114, located at 3702 Pennsylvania Ave., Dubuque, Iowa 52002.

10

Because that evidence would have been sufficient for a finding of probable cause that Defendant was renting the subject storage units at the time of the search warrant, Defendant has failed to demonstrate that the allegedly false statement was necessary to a finding of probable cause.

Defendant also contends that the search warrant affidavit failed to disclose eyewitness reports that "someone other than Mr. Tomkins" mailed the pipe bombs from the Rolling Meadows Post Office on January 26, 2007. In making this argument, Defendant relies heavily on a composite sketch that was prepared by the United States Postal Inspection Service based on accounts provided by clerks who were interviewed days after the pipe bombs were mailed and who did not know that pipe bombs were being mailed at the time that they allegedly encountered Defendant. Defendant asserts that he is innocent of the charges because, at least in his view, the composite sketch does not look like him.

Any significance of the sketch—and, indeed, of the clerks' accounts—is overwhelmed in context by the criminal complaint and supporting affidavit that the Government attached to and incorporated by reference into the search warrant affidavit. In that affidavit, the Government set out evidence that amply supported a finding of probable cause that Defendant committed the charged offenses, including (1) handwriting analysis that confirmed that Defendant's handwriting appeared on a number of the envelopes containing the threatening communications, including the pipe bombs, and (2) SEC documents showing that Defendant held at least 200 option contracts in both 3COM and Navarre during the time the threatening communications and pipe bombs were mailed,[1] and that Defendant would have substantially benefitted from an increase in those stock prices. The Government also attached the photograph of Individual A's

---

[1] According to the Government, Defendant was in fact the only non-institutional investor with that particular portfolio of stock holdings during the relevant time period. In his reply brief, Defendant disputes that he owned 200 or more option contracts for Navarre, at least as of June 15, 2006.

residence enclosed in a mailing postmarked on or about October 25, 2005, depicting the window of a vehicle from which the photograph was taken. The photograph was shown to several vehicle dealers and vehicle parts companies to identify possible makes and models of vehicles corresponding to the window frame and interior visible in the photograph. According to the agents who conducted that analysis, a four-door Chevrolet Lumina was the closest identified match. A photograph of a 1993 four-door Chevrolet Lumina was then obtained, compared with the photograph, and determined to be an approximate match. According to the Government, at the time of the mailing, Defendant was the registered owner of a red 1993 four-door Chevrolet Lumina. All of this evidence was sufficient to establish probable cause that Defendant was involved in mailing the threatening communications, including the pipe bombs, regardless of whether the composite sketch was disclosed and/or whether it accurately depicted Defendant.

Defendant's final argument is that the affidavit failed to include the fact that Defendant served as the secretary/treasurer for a union to avoid the requirement that warrants "be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas they contain." Def. Br. ¶ 15. However, Defendant fails to explain how this omission affected the probable cause determination. To the extent that Defendant is challenging the seizure of union records pursuant to the search of his home, his *Franks* motion addresses only the search of the storage units, where no such records were seized. In any event, the union financial records were within the scope of the search warrant's request for *any and all financial records*. Furthermore, in view of the substantial stock and option purchases that Defendant allegedly made as part of the securities fraud scheme set forth in the indictment in this case, those financial records would be relevant, as they might shed light on how Defendant funded those purchases. As Judge Lindberg obviously concluded in denying Defendant's motion to

suppress, that the records so far have not demonstrated that there was any use of union funds to purchase the stocks in question does not render their seizure and subsequent analysis inappropriate.

### III.     Conclusion

Defendant has failed to meet the considerable burden necessary to warrant a *Franks* hearing.  He has not shown that the affiant made any false statement intentionally or with reckless disregard for the truth, or that any false, misleading, or omitted information was necessary for the Magistrate Judge's finding of probable cause in this case.  For these reasons and the reasons stated throughout this order, the Court respectfully denies Defendant Tomkins's motion for an evidentiary or *Franks* hearing [175].

Dated:  February 28, 2011

‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ Robert M. Dow, Jr.
‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ United States District Judge