**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 07 CR 227 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| JOHN TOMKINS, | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are three post-trial motions filed by Defendant John Tomkins: a motion for a new trial [373]; a motion for a judgment of acquittal [374]; and a motion for a mistrial [375]. For the reasons set forth below, the motions [373, 374, 375] are respectfully denied.

**I.      Factual Background**

Prior to trial, on April 25, 2007, law enforcement officers arrested Defendant and executed search warrants at his residence, at two storage units rented by Defendant, at his place of business, and on various vehicles. The search of Defendant's residence led to the seizure of financial records showing Defendant's purchases of 3COM and Navarre stock, drafts of the threatening communications sent to the victims, research into the addresses of and other locations associated with the victims, proof of travel to Orlando, Florida, during the time in which some of the threatening communications were mailed from Kissimmee, Florida, and documents and other records related to bomb making. The search of Defendant's storage unit led to the seizure of bomb making materials, including materials similar to those used to build the devices mailed in January 2007, two improvised explosive devices, one of which was packaged and ready to be mailed, drafts of the threatening communications sent to the victims, and addresses and other information relating to the victims. Among other things, the search of Defendant's vehicles led to the seizure of bomb making materials.

Defendant was charged in a superseding indictment with ten counts of mailing threatening communications, 18 U.S.C. § 876(b), two counts of illegal possession of a destructive device, 26 U.S.C. § 5861(d), and one count of using a destructive device in connection with a crime of violence, 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii). At trial, the Government presented evidence that Defendant John Tomkins mailed a series of threatening letters and packages, including pipe bombs, to various investment firms and their employees, and that through those letters and packages, Defendant attempted to induce the investment firms and their employees, by threats of kidnapping, bodily injury, and death, to manipulate and cause the common stock of 3COM and Navarre Corporation to trade at artificially high prices, thereby fraudulently increasing the market value of Defendant's investment positions in those stocks. On May 4, 2012, a jury convicted Defendant of Counts 1-6 and 8-13.[1]

## II.     Motion for Judgment of Acquittal [374]

Defendant moves for a judgment of acquittal with respect to Counts 11, 12, and 13 of the superseding indictment. Counts 11 and 12 charged Defendant with the unlawful possession of destructive devices, in violation of 26 U.S.C. § 5861(d). Count 13 charged Defendant with possessing, using, and carrying a destructive device in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Defendant moves for a judgment of acquittal on Counts 11, 12, and 13 on the grounds that there was insufficient evidence for the jury to conclude that the Chicago and Kansas City Devices were destructive devices. Defendant also moves for judgment of acquittal with respect to Count 13 on the grounds that mailing a threatening communication in violation of 18 U.S.C. § 876(b) is not a "crime of violence."

---

[1]   During trial, the Government orally moved to dismiss Count 7, and the Court granted that request.

Under Federal Rule of Criminal Procedure 29, "[t]he Court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A Rule 29 motion should be granted only when "after viewing the evidence in the light most favorable to the United States, the trial court finds that no rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); see also *United States v. Hagan,* 913 F.2d 1278, 1281 (7th Cir. 1990). The Seventh Circuit has stressed that a defendant seeking a judgment of acquittal on sufficiency of the evidence grounds "bears a heavy burden and faces a nearly insurmountable hurdle." *United States v. Seawood,* 172 F.3d 986, 988 (7th Cir. 1999).

### A. Sufficiency of the Evidence as to Counts 11, 12, and 13

Defendant first argues that the Government "failed to prove beyond a reasonable doubt that the alleged devices were in fact destructive devices." Defendant contends that the Government did not prove that either of the charged devices contained an operable ignitor, batteries that were touching each other, or a switch that would have operated as stated in the accompanying threat letters. In making these arguments, Defendant ignores the evidence introduced at trial and the component-parts instruction that the jury received.

As Defendant notes, the Government's expert witnesses John Winslow and Raymond Voorhees similarly testified that, to constitute as a destructive device, a device needed to have a propellant, an ignitor, an energy source, and a switch. Defendant concedes that the evidence establishes the existence of a propellant in each device. DE 374 at 2. Concerning the ignitor, Defendant contends that the "ignitor in the Chicago device is clearly not functional," and cites to a photograph not admitted into evidence purportedly taken by Paul R. Laska, who did not testify. First, Defendant cannot rely at this stage of the proceedings on evidence not admitted at trial. He

is arguing that the ignitor evidence was not proven beyond a reasonable doubt, but in forming this argument, he is citing a document that they jury did not consider in its deliberations. Furthermore, the Government introduced testimony and evidence that, prior to Winslow and Voorhees reviewing the ignitors in the devices, bomb squads in Kansas City and Chicago rendered the devices safe by shooting projectiles and highly pressurized water at the devices. Such disruption could have affected the state of the ignitors in the devices, and the jury could have used its common sense and made this inference.

Additionally, the Government introduced evidence showing that the ignitor in the Chicago Device was in fact intact just after the Chicago bomb squad rendered that device safe. Government Exhibit 53L showed the interior of the Chicago Device soon after it was rendered safe. Inside the pipe shown in the exhibit is the ignitor that Defendant installed into that device. A close look at that ignitor reveals the two contacts of the ignitor touching each other and joined by igniting compound—the very compound that experts Winslow and Voorhees testified that Estes coats onto the ends of its ignitors to create the spark necessary for igniting propellants. Similarly, Government Exhibits 52K and 52M showed the Kansas City Device after it had been rendered safe, and in each exhibit, the contacts of the ignitor can be seen on contact and connected by the igniting compound. These exhibits were introduced at trial, were explained by the Government witnesses, and were discussed during the Government's closing arguments. The jury heard the significance of what Government Exhibits 52K, 52M, and 53L pictured. These exhibits, along with the other testimony and evidence introduced showing the ignitors after the render-safe procedures had been performed, about the ignitors and how they functioned, and about the render-safe procedures followed in Kansas City and Chicago on each device, gave the

jury ample evidence to conclude beyond a reasonable that Defendant installed functional ignitors into each of the Kansas City and Chicago Device.

Regarding an energy source, Defendant concedes—and the evidence overwhelmingly established—that Defendant installed charged batteries into each of the devices in question. Defendant argues that he introduced evidence showing that he intentionally separated the two batteries from each other to keep electrical current from flowing through them, and consequently, through the closed firing circuit. But other evidence introduced showed the arrangement of the batteries, and the jury reasonably could have concluded that the batteries were connected and that Defendant's testimony was not credible. In particular, Government Exhibit 53W showed the batteries that Defendant installed into the Chicago Device in the configuration in which he taped them together. The exhibit shows a small ridge in the tape between the two batteries, and, as the Government argued during closing arguments, that this ridge was the same size as the nipple on positive side of the battery. In other words, the ridge shown in Government Exhibit 53W was created when the positive end of one of the batteries was pressed against the negative end of the other battery and the two batteries were taped in that arrangement. For Defendant's statement to have been true, he must have left a minuscule space between the two batteries. The jury heard this evidence and argument and, in light of the Government's evidence, acted reasonably in discrediting Defendant's statements.

The jury's conclusion was supported by additional evidence and inferences that the jury was permitted to make. Mr. Voorhees did not testify that he observed any tape having been placed between the two batteries, nor did he testify that the batteries were arranged so that the two positive ends or two negative ends touched each other. Either such arrangement would have prevented any electricity from flowing through either circuit. The evidence showing that, in each

device, the positive end of one battery was in contact with the negative end of the other provides further support for the jury's conclusion that the batteries were in contact and that the two-battery arrangement was designed to allow for electrical current to flow once the firing circuitry was closed.

Defendant also argues that the Government "proved that the switch could **not** be used to construct a destructive device that could be used as a weapon," because "the only time that electricity could have flowed through the switch was when the two halves were in close proximity to each other." DE 374 at 3. Ample evidence and testimony was introduced through Voorhees and Winslow about how the switches functioned, Mr. Winslow conducted an in-court demonstration using a switch to show how close the two halves of the switch needed to come to each other for the switch circuitry to close, and Mr. Winslow discussed in depth—with the assistance of demonstrative exhibits—how the circuits in the Kansas City and Chicago Devices were designed and what steps needed to occur for the circuitry to close and the devices to ignite.

In particular, Mr. Winslow testified about how one wire had been left disconnected in the firing circuit in each device, and that unless the wire touched the exposed contact to which it was designed to connect, the circuit would not close. But Mr. Winslow testified about two ways in which the firing circuit in each device could have closed and caused an explosion. First, Mr. Winslow explained that the copper tip of each disconnected wire in each device was exposed and not covered with tape. According to Mr. Winslow, with the switch in either device in the closed position—meaning that the lid of the box containing the device was closed—had the bare copper tip of the wire touched the exposed contact to which the wire was designed to connect, the circuit would have closed, and the ignitor would have ignited. Mr. Winslow further testified that the

disconnected wire in each device was not itself taped to any part of the cardboard box or otherwise restrained from touching the exposed contact.

Second, Mr. Winslow testified that the threat letter that accompanied each device told the device recipients about the disconnected wire. Each letter stated, "The only reason you are still alive is because I did not attach one wire," and that "[i]f you do not believe me then go ahead and touch that red wire to the top of the battery pack." Gov't Ex. 15B; Gov't Ex. 16C. Mr. Winslow testified that if any recipient of either device had followed the taunt in either threat letter and had touched the red wire to the exposed contact, and had then closed the lid of the box, the firing circuit would have closed, causing current to heat the ignitor, light the propellant, and create an explosion.[2]

In sum, the evidence introduced by the Government lends ample support to the jury's conclusion that the circuitry in each of the charged devices was functional and could have worked to cause each device to explode.

### B.      Count 13

Defendant next argues that his conviction on Count 13, which charged him with using, carrying, and possessing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c), should be overturned because mailing a threatening communication under 18 U.S.C. § 876(b) is not a "crime of violence." As Defendant acknowledges, the Seventh Circuit previously held that a conviction for mailing threatening communications under § 876 is a crime

---

[2]     Defendant also ignores the combination-of-parts instruction given to the jury. According to that instruction, "destructive device" means "any explosive bomb or any combination of parts either designed or intended for use in converting any device into a destructive device and from which a destructive device may be readily assembled." DE 366 at 22. As the Government argued in closing, and as the jury was allowed to conclude, by placing a sealed pipe containing gun powder, shotgun pellets, and an ignitor into a box, and attaching the wires from the ignitor to batteries and a switch, also contained in the box, Defendant assembled a combination of parts readily convertible into a bomb. Defendant's set of parts—whether or not they were themselves all connected and set to explode—constituted destructive devices.

of violence for purposes of Career Offender Guideline § 4B1.1. See *United States v. Sullivan*, 75 F.3d 297, 299-300 (7th Cir. 1996) (relying on *United States v. Poff*, 926 F.2d 588 (7th Cir. 1991) (en banc)). Because the definition of a crime of violence under the § 4B1.1 is identical to the definition of crime of violence under § 924(c), that decision is binding on this Court and Defendant's argument fails. See also *United States v. Haileselassie*, 668 F.3d 1033 (8th Cir. 2012) (rejecting a nearly identical argument in examining whether mailing a threatening communication under § 876(c) was a crime of violence as defined in 18 U.S.C. § 16, which defines "crime of violence" identically to § 924). The Court concludes that mailing a threatening communication under § 876(b) is a "crime of violence" for purposes of § 924, and Defendant's argument fails.

## III. Motion for Mistrial [375]

Defendant moves for a mistrial and seeks to dismiss Counts 11 and 13 (which relate to the Chicago Device) with prejudice on the grounds that the Government violated Rule 16 and *Brady* by not disclosing the existence of an x-ray (Gov. Ex. 53dd) of the Chicago Device prior to the testimony of former Chicago Police Department Bomb Squad Officer Daniel McGuire. As an initial matter, the Government's failure to disclose the existence of the x-ray prior to Officer McGuire's testimony does not constitute a Brady violation, because the x-ray of the Chicago Device is not exculpatory in any way. See *United States v. Neal*, 611 F.3d 399 (7th Cir. 2010) (noting that *Brady* applies only to exculpatory material and not inculpatory material). Here, the x-ray shows the interior of the sealed pipe before it was rendered safe by the Chicago Police Department Bomb Squad. The x-ray shows, among other things, the wires leading to the ignitor (the Estes brand rocket engine ignitor), the shotgun pellets intended to increase the lethality of the device by providing additional fragmentation upon explosion, and the powder used as the

explosive material.  Defendant does not explain how this x-ray is at all exculpatory (nor does it appear that he could).  To the contrary, the x-ray on its face is inculpatory and, therefore, cannot constitute a *Brady* violation.

That leaves Defendant's challenge under Federal Rule of Criminal Procedure 16, which states that "the government must permit the defendant to inspect and to copy or photograph * * * papers, documents, data, [and] photographs," among other items, "if the item is within the government's possession, custody, or control."  Fed. R. Crim. P. 16(a)(1)(E); see also *United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir. 1997) ("Rule 16(a)(1)(C) imposes upon the federal government no duty to obtain documents that are controlled by the state government or police, even if the prosecution is aware of the items.").  Defendants are only entitled to inspect such items if they are "material to preparing the defense" or "the government intends to use the item in its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(E).

The Government represents that it first learned that an x-ray of the Chicago Device might exist on April 9, 2012, when the Government attorneys first met with Officer McGuire, formerly of the Chicago Police Department Bomb Squad, to conduct pretrial preparations.  At that meeting, Officer McGuire informed the Government attorneys that he took an x-ray of the sealed pipe in the Chicago device, before it was rendered safe.  Officer McGuire also indicated that he might still have a copy of the x-ray.  Upon learning this information, the Government attorneys requested that Officer McGuire search his files for that x-ray.  On April 17, 2012, at approximately 4:05 p.m. (approximately a week before trial was scheduled to begin), Officer McGuire forwarded a copy of the x-ray to the Government attorneys via email.

At trial, the Government attempted to introduce the x-ray during its case-in-chief.  Defendant objected, asserting that he had not been provided with a copy of the x-ray.  The

Government represented to the Court that it produced the x-ray, and Defendant insisted that the x-ray was not produced. The Court sustained Defendant's objection, and the Government was precluded from introducing the x-ray as part of its case-in-chief.[3] Defendant did not begin his case until the middle of the second week of trial. Defendant had five days after learning about the x-ray to prepare his defense accordingly.

Even assuming that the failure to disclose the x-ray prior to Officer McGuire's testimony constituted a Rule 16 violation, Defendant is not entitled to a new trial. Rule 16 provides that, if a party fails to disclose evidence in accordance with the Rule, the trial court may "order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Fed. R. Crim. P. 16(d)(2). A new trial is warranted only after all other, less drastic remedies are inadequate. See *United States v. Dennis*, 115 F.3d 524, 534 (7th Cir. 1997). Moreover, a new trial is appropriate only if the alleged Rule 16 violation prejudiced the defendant, which requires that a defendant show a likelihood that the verdict would have been different had the government complied with Rule 16. See *United States v. Miller*, 199 F.3d 416, 420 (7th Cir. 1999); *United States v. Salerno*, 108 F.3d 730, 743 (7th Cir. 1997); see also *United States v. Davis*, 397 F.3d 173, 178 (3d Cir. 2005).

Here, Defendant asserts that he was denied a fair trial because the late disclosure denied him an adequate opportunity to prepare a defense. Specifically, Defendant asserts that "the defense strategy in this case was based on the premise that there was no way of knowing the configuration of the inside of the contraptions before they were demolished." DE 375 at 12. However, at no point does Defendant explain how this late disclosure actually denied him an

---

[3] Although not allowed to admit the x-ray during its case-in-chief, the Government laid foundation for the introduction of the x-ray through Officer McGuire's testimony.

adequate opportunity to prepare that defense or present it to the jury. To the contrary, the Court's initial ruling barring the Government from introducing the x-ray in its case-in-chief preserved Defendant's opportunity to present exactly that defense to the jury. It was only after Defendant took the stand and testified that he took steps to ensure that the explosive powder was placed at the end of the sealed pipe opposite the ignitor – a claim clearly contradicted by the x-ray – that the Court concluded that Government could introduce the x-ray in rebuttal. Had Defendant not testified that he had placed the explosive powder at the end of the sealed pipe opposite the ignitor – in other words, had Defendant actually presented a defense based on the premise that there was no way of knowing the configuration of the inside of the contraptions before they were demolished – the x-ray would not have been admitted. At that point, Defendant would have been free to argue that there was no evidence presented by the Government showing the configuration of the sealed pipes before they were rendered safe. But Defendant instead chose to testify in a manner that put the x-ray back into play by telling the jury about how he constructed the devices. Defendant made that decision after the Court expressly warned Defendant that its initial decision excluding the x-ray was subject to reconsideration depending on what evidence Defendant presented in his case, including during his testimony.

More importantly, the outcome of the trial would not have been any different had Defendant had access to the x-ray prior to Officer McGuire's testimony. The Government presented overwhelming evidence regarding the configuration of the devices in this case. Thus, Defendant has failed to establish prejudice, which is fatal to his claim for a new trial.

## IV.     Motion for a New Trial [373]

Defendant also moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. The Rule provides that the court "may vacate any judgment and grant a

new trial if the interest of justice so requires."  Newly discovered evidence is the only specifically listed basis in the rule (Fed. R. Crim. P. 33(b)(1)), although the rule allows for a new trial on "other grounds," so long as the interest of justice requires it.  See Fed. R. Crim. P. 33(b)(2); see also *United States v. Bender*, 539 F.3d 449, 455-56 (7th Cir. 2008) (four-part test for new trial based on newly discovered evidence).  The Seventh Circuit has indicated that a motion for a new trial may be granted if there was insufficient evidence to support a conviction or if there were errors in evidentiary rulings.  See *United States v. Christ*, 513 F.3d 762, 775 (7th Cir. 2008).  Other appropriate bases have been recognized in other cases, if only implicitly at times.  See *United States v. Hendrix*, 482 F.3d 962, 967 (7th Cir. 2007) (prosecutorial misconduct); *United States v. Taglia*, 922 F.2d 413, 417 (7th Cir. 1991) (ineffective assistance of counsel); *Brodie v. United States*, 295 F.2d 157, 160 (D.C. Cir. 1961) (Burger, J.) (recognizing that the bases for a new trial that are embodied in Fed. R. Crim. P. 33(b)(2) are broad, though counseling that they are "temperately to be utilized").  In his motion, Defendant identifies 16 bases for a new trial.

### A.    Trial Transcripts

Defendant argues that the court abused its discretion when it denied his request for daily transcripts because of his *pro se* status and Defendant's claim that "he was not able to keep up with the proceedings."  DE 373 at 2.  However, a defendant does not have a constitutional or statutory right to daily transcripts. See *United States v. Sliker*, 751 F.2d 477, 491 (2d Cir. 1984) (holding that a district court's denial of defendant's request for daily transcripts was not an abuse of discretion or denial of defendant's constitutional rights).  Indeed, "[c]ommon experience informs us that it is entirely practicable to present an effective defense in a criminal case without daily copy, however convenient daily copy undoubtedly is." *Id.*  Nonetheless, the Court offered

to consider Defendant's request to have daily transcripts prepared on a witness-by-witness basis. In his motion, however, Defendant has failed to identify any witness for whom he requested daily copy and was denied. In his reply brief, he lists examples of instances in which, in hindsight, he would have benefitted from having transcripts, but he does not point to one instance in which he requested a transcript for a specific witness and the Court denied his request. In addition, Defendant has failed to demonstrate that having such transcripts would have made a difference to the outcome of the trial, particularly in light of the fact that Defendant conceded that he was guilty of 9 of the 12 counts submitted to the jury and in light of the overwhelming evidence against him as to all 12 counts. Finally, Defendant's claim that "he was not able to keep up with the proceedings" is belied by how Defendant conducted himself throughout the pre-trial proceedings and the trial and also stands in direct contravention of his pre-trial insistence that he could try the case himself, despite repeated warnings from the Court about the perils of self-representation. For these reasons, the Court did not abuse its discretion in denying Defendant's request for daily transcripts, particularly in light of the fact that the Court offered to consider Defendant's request to have daily transcripts prepared on a witness-by-witness basis and Defendant has failed to identify a single instance in which a request was not honored.

## B. Complete Defense

Defendant argues that the Court erred when it prevented him from cross-examining an SEC witness about allegations of insider trading and accounting irregularities at the victim companies. Although not directly stated, Defendant appears to be suggesting that he mailed the threatening communications and pipe bombs, at least in part, to avenge those companies and shareholders who purportedly were victimized by the irregularities. Notably, Defendant's motive

or motives for sending the letters and pipe bombs was relevant only to Counts One through Six and Eight through Ten, which charged Defendant with mailing threatening communications, in violation of 18 U.S.C. § 876(b). In his opening and closing statements, as well as his own testimony, Defendant admitted that he was guilty of those charges and expressly asked the jury to convict him of those charges. Furthermore, the testimony does not reflect that his sole motive in sending the threatening communications was to avenge the alleged insider trading and accounting irregularities. To the contrary, the Government introduced evidence and Defendant admitted that he wanted his victims to drive up the price of the victim stocks so he could make money from his stock and option holdings in the victim companies. This was sufficient to satisfy the third element of § 876(b), which required that the Government prove that Defendant mailed the threatening communications with the intent "to extort from any person money or other thing of value." There is no requirement that the financial motive was the only, or exclusive, motive which drove Defendant.

### C. Jury Instruction

Defendant argues that the Court erred when it granted the Government's oral motion to preclude Defendant from introducing any testimony or evidence concerning his subjective intent in constructing the devices at issue in Counts 11, 12, and 13 of the superseding indictment. During trial, the Court analyzed this issue in a minute order, finding that, because the "objective characteristics" of the devices and component parts at issue in this case were "useful only as weapons" and had "no legitimate social or commercial purpose as a matter of law," "the inquiry is at an end and subjective intent is not relevant." DE 357 at 3 (quoting *United States v. Johnson*, 152 F.3d 618, 628 (7th Cir. 1998)). Defendant argues that *Johnson* was wrongly decided, in part because he claims that *Johnson* removes the *mens rea* element from the statute in combination of

parts cases. *Johnson* is on all fours with this case and is binding Seventh Circuit precedent. The Court cannot ignore Seventh Circuit precedent and therefore Defendant's challenge to the Court's jury instruction fails.

Additionally, contrary to what Defendant suggests, *Johnson* did not remove *mens rea* from the statute in combination-of-parts cases. As the Court instructed the jury, to prove the Defendant guilty of the unlawful possession an unregistered explosive device, in violation of 26 U.S.C. § 5861(d), the Government had to prove, among other things, that Defendant knew that the firearm possessed the characteristics that qualified it as a destructive device. DE 366 at 20. In other words, the Government had to prove that Defendant knew that the devices contained all the components necessary to qualify it as a destructive device. That is a *mens rea* requirement, and *Johnson* did not relieve the Government of that burden.

Section 5845(f)(3) defines "destructive device" (among other ways) as "any combination of parts either designed or intended for use in converting any device into a destructive device * * * and from which a destructive device may be readily assembled." 26 U.S.C. § 5845(f)(3). *Johnson* held that, when the Court determines in a combination of parts situation that the device in question is "useful only as a weapon" and has "no legitimate social or commercial purpose," the defendant's subjective intent is irrelevant for purposes of § 5845(f)(3). In other words, in such cases, a defendant cannot claim, as Defendant does here, that, while he assembled all the parts necessary to fashion a destructive device – i.e., the defendant knew that the devices had all the characteristics of a destructive device – he took certain steps to ensure (or hopefully ensure) that the device would not explode, for example, by not connecting one last wire. Such evidence is irrelevant because, in § 5845(f)(3), Congress determined that it is illegal for someone to

knowingly take all the components necessary to build a bomb and put them in one place from which a functional destructive device could be "readily assembled."

As *Johnson* recognized, § 5845(f)(3) contains an exception in cases in which the device in question has some arguable social utility other than as a bomb. In such cases, it would be a defense for a defendant to assert that he has built some device other than a bomb – a firecracker for example – or that he possessed the combination of parts to build a firecracker, rather than a bomb. In such cases, the defendant's subjective intent would be relevant and admissible. Here, Defendant never claimed that he had built some device – or had assembled the parts to build some device – that had any function other than as a bomb, nor did the evidence suggest any other plausible use. And, because § 5845(f)(3) prohibits any person from knowingly possessing all of the parts from which a destructive device could be readily assembled, it was irrelevant whether Defendant took any steps to ensure (or, again, hopefully ensure) that the device he built would not explode. Because Defendant's intent was irrelevant, the Court properly instructed the jury.[4]

### D.     Continuance

Defendant argues that the court erred when it did not order a continuance after Defendant claimed he was "dead on his feet" and that he was "not able to think straight because he was exhausted." DE 373 at 7. However, the Court did in fact continue the trial after the Defendant made those allegations – recessing court early in the morning until the following day to allow Defendant the opportunity to better prepare for the continuing trial. Defendant did not make the

---

[4]     Additionally, § 5845(f)(3) required the Government to prove that the combination of parts was "*designed* or intended" for use in converting a device into a destructive device, and the jury was so instructed. See § 5845(f)(3) (emphasis added). During trial, the Court permitted Defendant to introduce evidence of the design of the devices. Defendant testified that a wire was disconnected in the circuitry; that the batteries taped together in each device were separated from each other so as to prevent current from flowing, even if the circuit was otherwise closed; and that in at least one device, he separated the explosive powder in the pipe from the ignitor by surrounding the ignitor with shotgun pellets.

same allegations the following day when trial resumed. Defendant also was cautioned countless times (both formally in colloquies and informally at status hearings) of the risks of representing oneself and the rigors of trial. Yet Defendant insisted on representing himself. The jury ultimately rejected his defenses, and he now claims that the Court's failure to continue the trial constitutionally prejudiced him. Defendant has in no way demonstrated that the trial would have turned out differently had he received a continuance. The Court has substantial discretion in controlling the conduct of the trial and was in a position to observe Defendant throughout. Defendant comported himself professionally, and the Court did not err in delaying trial indefinitely to give Defendant time to rest.

## E. Deprivation of Food

Defendant next argues that the Court erred when it did not order the United States Marshal's Service to provide him "with an edible meal during the trial." DE 373 at 7-8. Contrary to what Defendant asserts, he was provided access to food during the trial – during lunch, he had access to the same meal that the other prisoners, including other prisoners on trial, received in the lockup on the 24th floor of the courthouse. That Defendant did not like the food that he was provided does not rise to the level of a constitutional violation or warrant a new trial. In any event, Defendant's argument fails because he had not demonstrated that he was prejudiced as a result of the alleged food deprivation. During trial, Defendant's behavior was far from a man who was rendered incompetent by alleged food deprivation.

## F. Access to Defense Witnesses

Defendant asserts that he was denied a fair trial because he was unable to call additional defense witnesses. However, Defendant was aware that he had access to the compulsory process of the court, as well as stand-by counsel who diligently served trial subpoenas on Defendant's

behalf and who was available to assist Defendant with just these type of pre-trial issues.[5]  More significantly, Defendant has failed to provide a proffer of the expected testimony of the witnesses he was allegedly denied access to and an explanation of how their testimony would have resulted in a different outcome.  Again, in light of the overwhelming evidence introduced against Defendant, Defendant has not demonstrated that he was prejudiced by the alleged error.

### G.    Jury Questionnaire

Defendant argues that the Court abused its discretion when it denied his request to have the jury fill out a questionnaire during *voir dire*.  Once again, Defendant fails to articulate how he was prejudice by this alleged error.  Moreover, prospective jurors did recite their answers to the Court's standard jury questionnaire, after which the Court asked prospective jurors various questions that the parties had formulated, including some formulation of the numerous *voir dire* questions that Defendant submitted.  The Court's *voir dire* was exhaustive of the relevant issues presented by the parties and certainly not prejudicial to Defendant.

### H.    Speedy Trial, Discovery, Search Warrants, Referring to Self in the Third Person, Bill of Particulars, and Rule 404(b).

Defendant renews a series of motions he filed pretrial relating to the Speedy Trial Act, discovery disputes, motions to suppress search warrants, the Court's order requiring Defendant to refer to himself in the third person when speaking about himself as the defendant, a bill of particulars, and Rule 404(b). Defendant raises no new issues in those motions, and identifies no grounds on which the Court erred in its previous rulings.  Therefore, the Court stands on its prior rulings and will not order a new trial on the basis of these alleged errors.

---

[5]   In fact, to that end, the Court met with Defendant and standby counsel on several occasions before trial to ensure that Defendant had access to the expert witnesses he wished to consider.

## I.      Role of Stand-By Counsel

Defendant argues that he was denied a fair trial when the Court "refused to allow stand-by counsel to be of assistance to the defendant."  In making this argument, Defendant suggests that the Court did not allow stand-by counsel to have any role in the direct examination of Defendant. Defendant's argument is both factually and legally incorrect.  First, prior to trial, the Court explained repeatedly the limited role that standby counsel could assume in the trial, and Defendant acknowledged prior to trial that he understood this.  Then, prior to Defendant's testimony, the Court recessed the trial to allow Defendant an opportunity to prepare a detailed outline to give to stand-by counsel, identifying the areas of inquiry that Defendant, who was representing himself, wanted to explore in his direct examination.  After Defendant prepared that outline, the Court then permitted stand-by counsel to ask questions of Defendant on direct examination based on Defendant's outline.  Defendant fails to identify any questions that were not asked during his direct examination, let alone explain how those unidentified, unasked questions would have resulted in a different outcome at trial.

In retrospect, Defendant may now regret his decision to represent himself.  But that is not a basis for a new trial, particularly after repeated warnings from the Court on the difficulties in representing oneself, strong urging from the Court to Defendant to accept representation, and numerous colloquies in which the Court advised Defendant not only of his rights but of the risks of representing oneself during a criminal trial.  See, *e.g.*, *Faretta v. California*, 422 U.S. 806, 819-20 (1975); *McKaskle v. Wiggins,* 465 U.S. 168, 176-78 (1984) ("[T]he objectives underlying the right to proceed pro se may be undermined by unsolicited and excessively intrusive participation by standby counsel."); *Simpson v. Battaglia*, 458 F.3d 585, 597 (7th Cir. 2006). ("When standby counsel is appointed, the primary concern is that appointed counsel does too

much, so as to abrogate the *Faretta* right to self-representation, not too little"). To the extent that Defendant believes that "hybrid representation" would have been appropriate, the Court has previously explained to Defendant that hybrid representation is "disfavored" in the Seventh Circuit and that "whether a defendant may act as co-counsel along with his own attorney, is a matter within the discretion of the district court." See *U.S. v. Chavin*, 316 F.3d 666, 672 (7th Cir. 2002); see also *United States v. Singleton,* 107 F.3d 1091, 1101 n. 7 (4th Cir. 1997) ("The cases reiterating the principle that courts are not required to allow defendants to split the responsibilities of the representation with an attorney are myriad."). The Court stands on its prior rulings with respect to this issue.

### J.    Alleged Daubert Errors

Defendant argues that the Court made three errors under *Daubert* in admitting the Government's expert testimony.   First, Defendant reasserts his pretrial objections to the Government's expert disclosures.  However, Defendant raises no new issues and fails to explain how the Court erred in its initial order regarding expert testimony.  Second, Defendant argues that the Court erred when it allowed the Government to admit schematics of the Chicago and Kansas City Devices as demonstrative exhibits during the expert testimony of John Winslow, because these schematics were not produced prior to trial.  However, as the Court recognized at trial, the schematics were introduced solely for demonstrative purposes as an aid for the jury to follow and understand Winslow's testimony regarding the circuitry on the two devices.  This was well within the Court's discretion. Third, Defendant argues that the Court erred when it allowed Mr. Winslow to demonstrate to the jury how the magnetic reed switch in the devices operated. Mr. Winslow demonstrated this by: (1) using a wire with alligator clips to attach a battery source to the same type of reed switch as used in the devices; (2) using a wire with alligator clips to

attach the other end of the magnetic reed switch to a red light bulb; and (3) attaching another wire from the light bulb to the other end of the battery source. Mr. Winslow then moved the two sides of the magnetic reed switch closer together to turn on the light and then moved the two sides of the switch apart to turn off the light. As with the schematics discussed above, this demonstration was introduced as an aid for the jury to follow and understand Mr. Winslow's testimony regarding how the magnetic reed switch operated. The introduction of this testimony and demonstrative was well within the Court's discretion.

### K. Cumulative Error

Because Defendant has not identified any errors committed by the Court, there is no need to address Defendant's cumulative error theory. The Court simply reiterates that the evidence of Defendant's guilt presented at trial, including Defendant's admission of guilt as to nine of the charges, was overwhelming as to all 12 charges.

## V. Conclusion

For these reasons, the Court respectfully denies Defendant John Tomkins' motion for a new trial [373], a motion for a judgment of acquittal [374], and a motion for a mistrial [375].

Dated: January 4, 2013

_____
Robert M. Dow, Jr.
United States District Judge